**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Case No. 8:19-cv-01363-CEH-SPF**

MARIO SCOTT,

Plaintiff

vs.

UNITED PARCEL SERVICE,

Defendant.
_______________________________________/

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Defendant United Parcel Service, Inc. (Ohio) ("UPS") files its Motion for Summary Judgment and Supporting Memorandum of Law pursuant to Federal Rule of Civil Procedure 56, Local Rule 3.01, and the Court's Scheduling Order (Dkt. No. 18) and, in support thereof, respectfully shows the following:

## I. INTRODUCTION

Plaintiff Mario Scott, a current employee of UPS, was hired as a part-time package handler and has since been promoted into a coveted full-time Package Car Driver position. Despite this promotion and other opportunities for advancement he has received throughout his employment, and despite having been treated exactly the same as the Hispanic co-worker he identifies as a comparator, Scott now claims he suffered race discrimination and retaliation in violation of the Florida Civil Rights Act. Scott states that during the 2017 holiday season, Victor Torres was permitted to work in a part-time Driver position; but, the evidence establishes that Scott was ***also*** allowed to work as a part-time driver during the 2017 holiday season. Scott also complains that

he was required to attend a weeklong training course in January 2018 as a prerequisite to obtaining a full-time Driver position; but, Torres was ***also*** required to attend that same weeklong training course. Finally Scott asserts that his disqualification from the driver training course was motivated by discrimination. In fact, UPS disqualified Scott for flouting the company's Appearance Guidelines, ignoring instructors' directions, and failing uniform inspections on three consecutive days. Very simply, Scott's disqualification was the result of his own inaction and obstinate refusal to comply established company policies. Torres attended the same class and was held to the same standards as Scott.

Scott's claims are now ripe for summary judgment. First, he cannot meet his burden and establish by a preponderance of the evidence *prima facie* claims under the Florida Civil Rights Act. Most notably, Scott cannot prove (i) he was treated less favorably than similarly situated non-Black Drivers, as is required to state an FCRA race discrimination claim and (ii) he engaged in protected activity, or that there is a "causal connection" between such activity and any of UPS's decisions, which is fatal to his retaliation claim. Furthermore, if the Court proceeded with its *McDonnell-Douglas* burden-shifting analysis, UPS has articulated legitimate reasons for each decision at issue. Scott then fails to meet his ultimate burden to show pretext by a preponderance of the evidence, because (i) all decisions at issue were mandated by company policy, (ii) Scott's own sworn testimony undermines any suggestion that UPS's justifications are false or unworthy of credence, and (iii) Scott admits that UPS's relevant management personnel have never made comments that were negative or critical regarding his race.

For each of these reasons, UPS respectfully requests the Court grant summary judgment and dismiss each of Scott's claims with prejudice.

## II. LOCAL RULE 3.01 STATEMENTS

In accordance with Local Rule 3.01, UPS provides the following statements.

UPS requests dismissal of Plaintiff Mario Scott's claims with prejudice in their entirety pursuant to Federal Rule of Civil Procedure 56. Defendant further requests it be awarded its taxable costs incurred in defense of this matter. Defendant contends Plaintiff is unable to establish even a *prima facie* claim for race discrimination or retaliation, warranting dismissal of all claims with prejudice on that basis. Furthermore, even assuming *arguendo* that Plaintiff can establish any *prima facie* claims, Defendant has articulated legitimate, non-discriminatory, and non-retaliatory reasons for any adverse employment actions affecting Plaintiff, and Plaintiff cannot show such reasons are pretextual by a preponderance of the evidence, further warranting dismissal of all claims with prejudice.

## III. FACTUAL BACKGROUND

### *A. Overview of Scott's Employment with UPS.*

1. Plaintiff Mario Scott began his employment with UPS in October 2011, and at all times thereafter has been employed in UPS's Tampa Bayside Center. Ex. 1, Scott Dep. 13:9-12, 19:22-20:7; Ex. 2, M. Scott EHP.

2. UPS is a unionized company that is organized by the International Brotherhood of Teamsters. Ex. 3, Dore Decl. ¶ 3. Most of UPS's hourly employees, including those employed as Package Handlers, Package Car Drivers, and similar positions, are members of the company's bargaining unit. *Id.* The employment of these bargaining unit employees, including Scott, is subject to the terms and conditions of UPS's collective bargaining agreement (CBA) and applicable supplements. *Id.*; Ex. 1, Scott Dep. 25:17-21; Ex. 4, CBA Excerpts.

3. The CBA dictates that newly hired bargaining unit employees must complete a thirty working day "probationary" period before obtaining seniority. Ex. 4, CBA Art. 46 ("Acquisition of Seniority"). Thus, in early 2012 Scott completed his thirty working day

probationary period, obtained "seniority" under the CBA, and earned a position on the company's regular seniority list. *Id.*; Ex. 3, Dore Decl. ¶ 4. Scott does not dispute that his seniority date—the date on which he completed his probationary period, and from which his eligibility for certain promotions is based—is January 4, 2012. Ex. 1, Scott Dep. 13:9-12, 36:22-37: 16; Ex. 2, M. Scott EHP (reflecting January 4, 2012 seniority date).

4. After completing his probationary period, Scott moved into a part-time Preloader position. Ex. 1, Scott Dep. 30:15-18. Throughout the time periods relevant to his claims, Scott has worked under the management of Tom Teimer (White), the Tampa Bayside Center Business Manager, and Supervisors Justin Drew (White) and Marvin McGruder (African American). Ex. 1, Scott Dep. 20:8-13, 21:1-22.

***B. Scott Bids for and Receives Saturday Air Driver Position During 2017 Peak Season.***

5. Each UPS small package center, including the Bayside Center, operates a fleet of "package cars"—the company's iconic brown delivery vehicles. Ex. 5, Teimer Decl. ¶ 3. These package cars are driven by UPS's Package Car Drivers, whose job responsibilities generally include delivering packages to, and retrieving packages from, the company's customers. *Id.*

6. UPS's package centers typically handle a far higher volume of packages during the year-end holiday season. Ex. 1, Scott Dep. 40:16-41:12. During this "peak" season, employees may be offered the opportunity to work longer hours or temporarily fill new roles to ensure packages are delivered timely. *Id.* For example, UPS's small package centers often need additional Package Car Drivers to meet delivery needs during the peak season. Ex. 5, Teimer Decl. ¶ 5; Ex. 1, Scott Dep. 40:16-41:12.

7. UPS's CBA requires that vacant bargaining unit positions be posted internally for interested employees to "bid" on. Ex. 3, Dore Decl. ¶ 5; Ex. 1, Scott Dep. 31:25-32:20. In anticipation of higher volume expected during the 2017 peak season, one such bid list was posted in the Tampa Bayside Center on September 19, 2017. Ex. 6, Sept. 19, 2017 Bid List; Ex. 3, Dore

Decl. ¶ 5. This particular bid list offered union employees the opportunity to bid for a peak season Saturday Air Driver position.[1] Ex. 6, Sept. 19, 2017 Bid List; Ex. 5, Dore Decl. ¶ 3.

8. In accordance with the CBA, interested employees were selected to fill this Saturday Air Driver position based on their seniority date—*i.e.*, the most senior employees who bid on the position would be given the chance to qualify for the position first. Ex. 3, Dore Decl. ¶ 8. Accordingly, employees Johane Moultin (African American, 8/14/2006 seniority date), Anthony Cantu (Hispanic, 7/12/2011 seniority date), Scott and Victor Torres (African American and Hispanic, respectively, both with a 1/4/2012 seniority date) were selected. Ex. 6, Bid List; Ex. 2, Scott EHP (reflecting 1/4/12 seniority date); Ex. 22, Torres EHP (reflecting 1/4/12 seniority date); Ex. 7, Sanchez Decl. ¶ 6 (reflecting other employees' races and seniority dates).

9. However, mere seniority alone is not sufficient to qualify employees to work as Drivers or to operate UPS's package cars. Ex. 3, Dore Decl. ¶ 6; Ex. 5, Teimer Decl. ¶ 7. Driver candidates must also obtain a DOT card, complete training, and satisfy other requirements. Ex. 3, Dore Decl. ¶ 6; Ex. 5, Teimer Decl. ¶ 7. Because these Saturday Air Driver positions were posted in preparation for the peak season, the employees who bid for the positions were not required to complete the more extensive training required of full-time candidates. Ex. 3, Dore Decl. ¶ 7; Ex. 5, Teimer Decl. ¶ 8. Rather, before being able to work as Saturday Air Drivers, Scott, Moultin, Cantu, and Torres were only required to complete a three-day training course offered locally within the Tampa area. Ex. 5, Teimer Decl. ¶ 8; Ex. 1, Scott Dep. 43:8-44:6.

10. All four employees completed the abbreviated local course and were permitted to drive peak season Air routes on an as-needed basis. Ex. 5, Teimer Decl. ¶ 8; Ex. 8, M. Scott Pay History Reports (reflecting work in driving position in December 2017); Ex. 9, Charge (admitting Scott worked as a Driver on at least 12 days in December 2017). However, shortly after qualifying as Air Drivers, Moultin and Torres both indicated to Teimer that they would also be willing to

[1] As the name suggests, "Air" Drivers deliver expedited, overnight packages that typically must be delivered during the early morning hours. Ex. 5, Teimer Decl. ¶ 6.

deliver Ground packages, if the need for such work arose. Ex. 5, Teimer Decl. ¶ 10. Based on the Bayside Center's peak season volume, Teimer in fact needed extra assistance, particularly with regard to the delivery of bulk and irregular Ground packages. *Id*. Teimer confirmed that allowing qualified employees to deliver Ground packages complied with the CBA. *Id.*; Ex. 3, Dore Decl. ¶ 9. Thus, Moultin and Torres, who had greater and equivalent seniority to that of Scott, respectively, were also approved to deliver Ground packages. Ex. 5, Teimer Decl. ¶¶ 9-10.

11. Shortly thereafter, Scott also expressed interest in delivering Ground packages. *Id.* ¶ 11. Based on the Center's significant holiday volume and the need for additional Drivers, Scott was also approved to deliver Ground packages as needed during the 2017 peak season.[2] *Id*. Scott admits that, despite only bidding on a Saturday Air Driver position initially, he ultimately worked as a Driver on at least twelve days in December 2017. Ex. 9, Charge; Ex. 8, M. Scott Payroll History Report; Dkt. No. 1, Pl.'s Compl. at ¶ 14.

### *C. In Early January 2018, Scott Bids for Full-Time Package Car Driver Position.*

12. UPS's package volume typically returns to normal levels by mid-January, when the peak season is deemed to end. Ex. 5, Teimer Decl. ¶ 13; Ex. 1, Scott Dep. 40:16-25. At that time employees who worked in temporary peak season positions, including Scott and others, generally cease performing such work and return to their former positions. Ex. 5, Teimer Decl. ¶ 13. For Scott, this meant returning to his part-time Preloader position. Ex. 1, Scott Dep. 30:7-18, 122:20-23.

13. Nevertheless, in early 2018 several full-time Package Car Driver positions came open in the Bayside Center. Ex. 5, Teimer Decl. ¶ 14. Once again, the most senior employees who bid on these full-time positions were given the first opportunity to qualify including, among others, Scott and Torres. *Id.* ¶¶ 14-16; Ex. 3, Dore Decl. ¶ 13; Ex. 1, Scott Dep. 65:3-20. For his

[2] Scott claims he was only permitted to deliver Ground packages, in addition to working as a Saturday Air Driver, after filing a grievance under the company's CBA. Ex. 1, Scott Dep. 59:1-10. However, UPS's records do not reflect it received any such grievance, nor did Scott produce such a grievance during discovery in this lawsuit. Ex. 3, Dore Decl. ¶ 11. Teimer's testimony indicates that Scott was approved to deliver Ground packages, in addition to his Saturday Air Driver work, once he expressed interest in that position. Ex. 5, Teimer Decl. ¶ 11.

part, Scott signed a Bid Acknowledgement on January 9, 2018, acknowledging that he had been offered a full-time Package Car Driver position. Ex. 10, Bid Acknowledgement; Ex. 1, Scott Dep. 65:3-20.

### *D. Scott and Other Full-Time Driver Candidates Required to Complete Weeklong Training Course.*

14. Safety is of paramount importance to UPS. Ex. 5, Teimer Decl. ¶¶ 7, 15. As such, before being promoted to full-time Package Car Driver positions, candidates must satisfy a host of demanding prerequisites, including attending certain training courses, completing another thirty-day probationary period, and completing several supervised rides. *Id*. ¶ 15. For example, UPS requires full-time Driver candidates complete a weeklong training course at one of its Integrad training facilities. *Id*. ¶¶ 15-16. These Integrad courses are more detailed and rigorous than the abbreviated training sessions held for peak season Drivers. *Id.*

15. There is no dispute that Scott was informed of the requirement to complete this weeklong training course. Scott's Bid Acknowledgement expressly told him he would be required to "attend … the driver school," and that he was required to complete all requirements before obtaining a full-time position. Ex. 10, Bid Acknowledgement; Ex. 1, Scott Dep. 65:3-20. Scott also admits that in early January 2018, Human Resources Representative Desiree Garcia notified him that he, Torres, and other full-time Driver candidates would be required to complete a weeklong training course. Ex. 1, Scott Dep. 75:17-77:9; Ex. 24, Text Messages. It is therefore undisputed that, despite having completed the abbreviated three-day training course during the preceding peak season, both Scott and Torres were required to complete the longer Integrad course as part of their bid for a full-time Driver position. Ex. 5, Teimer Decl. ¶¶15-16; Ex. 1, Scott Dep. 81:9-23.

16. UPS's Integrad program operates a series of high-tech, next generation training facilities at ten sites throughout the United States, including one in Lake Mary, Florida. Ex. 11, Teresi Decl. ¶¶2-4. Scott was directed to attend training at this Lake Mary Integrad facility. *Id.* ¶ 7. The Lake Mary facility is operated independently of UPS's delivery centers, and is managed by Integrad Manager Chrissy Teresi, who oversees a team of Facilitators, including John Freiwald. Ex. 11, Teresi Decl. ¶¶ 3-4; Ex. 12, Freiwald Decl. ¶ 2.

### *E. Scott Fails Uniform Inspections on Three Consecutive Days and is Disqualified From Integrad Training Course.*

17. Most of UPS's contact with the public occurs through interactions with the company's Package Car Drivers. Ex. 5, Teimer Decl. ¶ 4; Ex. 7, Sanchez Decl. ¶ 3. Due to their public-facing positions, UPS policy requires that Package Car Drivers maintain a professional appearance at all times, including through established grooming and uniform rules. Ex. 5, Teimer Decl. ¶ 4; Ex. 7, Sanchez Decl. ¶ 3. These rules are codified in the "UPS Driver Uniform and Personal Appearance Standards," informally referred to as the company's Appearance Guidelines. *See* Ex. 13, Appearance Guidelines; *see also* Ex. 14 Policy Book (noting drivers are required to maintain a "neat" appearance and "wear standard uniforms as a distinct reflection of our company and our service."). Among other requirements, the company's Appearance Guidelines dictate that each Package Car Driver must:

- Wear their "complete uniform" while on duty; and
- Ensure that "[a]ll uniform aparts [are] in good condition (no tears, frayed collars, etc.)."

Ex. 13, Appearance Guidelines.

18. Scott was repeatedly warned that strict compliance with the Appearance Guidelines would be required throughout the Integrad course. For instance, Scott admits that he received a packet of materials, including policies, training forms, and other directions, before departing for

the Lake Mary facility. Ex. 1, Scott Dep. 81:24-83:6. Within this package, Scott was instructed he was "required to wear [his] UPS issued uniform each day," and that "**the uniform and appearance guidelines will be strictly adhered to**." Ex. 15, Info. Regarding Lake Mary Training (emphasis added). Scott was further warned that "neat and clean uniforms are required daily at all class sessions," and that the "uniform and personal appearance standards must be adhered to throughout the training week."[3] Ex. 16, Guidelines for Students Attending a Corporate School.

19. To emphasize the importance of the Appearance Guidelines, Integrad Facilitators conduct daily uniform and appearance inspections. Ex. 11, Teresi Decl. ¶ 6; Ex. 12, Freiwald Decl. ¶ 3. During these inspections, attendees are evaluated to verify both their work uniforms and appearance comply with the Appearance Guidelines. Ex. 11, Teresi Decl. ¶ 6; Ex. 12, Freiwald Decl. ¶ 3. Facilitators note each Appearance Guidelines violation they observe and give attendees specific instructions on how to correct these issues. Ex. 11, Teresi Decl. ¶ 6; Ex. 12, Freiwald Decl. ¶ 3; Ex. 1, Scott Dep. 100:14-23. Employees are further warned that if all uniform and appearance issues are not corrected by the third course day (typically a Wednesday), they will be disqualified from further participation in the course. Ex. 11, Teresi Decl. ¶ 6; Ex. 12, Freiwald Decl. ¶ 3.

20. On January 22, 2018, the first day of the course attended by Torres and Scott, both individuals were non-compliant with the Appearance Guidelines, in several ways. Ex. 17, Jan. 22, 2018 Inspection Report; Ex. 18, Freiwald Memo. For his part, Torres was wearing non-compliant shoes and had other uniform violations. Ex. 17, Jan. 22, 2018 Inspection Report; Ex. 18, Freiwald Memo. Scott had approximately seven different Appearance Guidelines violations, including visible tattoos, facial hair, uniform violations, non-compliant shoes, and a missing belt. Ex. 17,

[3] Notably, prior to leaving for this course, Scott did not notify UPS's management that any portion of his uniform was deficient or missing. Ex. 25, Garcia Decl. ¶ 3; Ex. 5, Teimer Decl. ¶ 16; Ex. 7, Sanchez Decl. ¶ 4.

Jan. 22, 2018 Inspection Report; Ex. 18, Freiwald Memo. Scott admits to being warned that he would be disqualified if these violations were not corrected by Wednesday, the third day of his training. Ex. 1, Scott Dep. 101:10-102:8; Ex. 18, Freiwald Memo. Scott was specifically warned that he needed to wear a "plain black or brown leather belt to pass uniform inspection." Ex. 18, Freiwald Memo. Scott said he understood these instructions. Ex. 18, Freiwald Memo; *see also* Ex. 1, Scott Dep. 104:9-16 (Scott admitting he "was told that [he would] be disqualified during the first day of class if [he] didn't have a brown or black leather belt …").

21. During second day of class, January 23, 2018, Scott yet again failed to pass his uniform inspection. While Scott had replaced his shoes and was wearing a belt, the belt was worn and braided—not a plain leather belt, as he had been instructed the prior day.[4] Ex. 18, Freiwald Memo; Ex. 19, Jan. 23, 2018 Uniform Inspection; Ex. 1, Scott Dep. 109:2-110:5. For his part, Torres had just one uniform violation on the second course day, as compared with the three observed during the prior day. Ex. 19, Jan. 23, 2018 Inspection; Ex. 18, Freiwald Memo. Torres and Scott were both told that they would be disqualified if any Appearance Guidelines violations were observed on the following day. Ex. 18, Freiwald Memo; Ex. 1, Scott Dep. 110:11-13.

22. Unfortunately, Scott failed to correct all cited issues and yet again failed his uniform inspection on the third course day. Despite having been directed on Monday and Tuesday to wear a plain leather belt, on Wednesday January 24, 2018 Scott was wearing a worn, stitched belt that contained gray fabric. Ex. 12, Freiwald Decl. ¶ 5; Ex. 18, Freiwald Memo; Ex. 23, Photograph; Ex. 1, Scott Dep. 111:22-113:21; Ex. 20, Jan. 24, 2018 Inspection Report. Having failed to pass the uniform inspection on three consecutive days, Scott was disqualified from the

[4] Because Scott and Torres both were warned of Appearance Guidelines violations on the first day of training, including for non-compliant shoes, the two individuals drove to a nearby store the evening of January 22, 2018 to purchase new items. Ex. 1, Scott Dep. 106:15-18, 108:1-8. However, despite having access to this store, Scott inexplicably failed to purchase a plain leather belt, as he had been instructed. *Id*.

training course and left the Lake Mary facility that same day. Ex.18, Freiwald Memo; Ex. 12, Freiwald Decl. ¶ 5; Ex. 11, Teresi Decl. ¶¶ 7-8.[5]

### *F. Scott Declines Second Opportunity to Complete Training Just Three Weeks Later But is Ultimately Promoted to Full-Time Package Car Driver.*

23. Notably, Scott was not separated from UPS or otherwise penalized after his disqualification from training; instead, he simply returned to his part-time Preloader position. Ex. 5, Teimer Decl. ¶ 17; Ex. 1, Scott Dep. 122:20-23.

24. Just ***three weeks later***, in mid-February 2018, Scott was presented with yet another chance to complete the Integrad training course and obtain a full-time Driver position. Ex. 10, Bid Acknowledgement; Ex. 1, Scott Dep. 127:24-128:4; Ex. 25, Garcia Decl. ¶ 4. Scott, however, declined the chance to attend the training course in February 2018 and therefore passed on the opportunity to qualify as a full-time Package Car Driver at that time. Ex. 5, Teimer Decl. ¶ 18; Ex. 10, Bid Acknowledgement Form (Scott acknowledging he declined the February 2018 course); Ex. 1, Scott Dep. 126:9-15, 127:24-128:4.

25. UPS continued to offer Scott opportunities to complete the required training and become a full-time Package Car Driver. Ex. 25, Garcia Decl. ¶ 4; Ex. 3, Dore Decl. ¶ 14. Scott finally completed the weeklong training course many months later, and in January 2020 was promoted to full-time Package Car Driver, a position he still holds today. Ex. 5, Teimer Decl. ¶ 19; Ex. 1, Scott Dep. 13:6-8.

### *G. Scott Files Charge of Discrimination, Culminating in This Lawsuit.*

26. On March 19, 2018 Scott filed a charge of discrimination with the Equal Employment Opportunity Commission. Ex. 9, Charge. In his charge, Scott alleged he suffered

[5] For his part, Scott admits that these uniform inspections were conducted in private. Ex. 1, Scott Dep. 116:1-7. As such, he lacks knowledge of how the uniform rules were applied other attendees and, by extension, cannot speculate as to the uniform compliance of other employees in his class. *Id.*

race discrimination and retaliation as a result of (i) allegedly being denied driving opportunities during the 2017 peak season, (ii) being required to attend the weeklong Integrad training course in January 2018, and (iii) his disqualification from the Integrad course. *Id.* Scott alleges he was treated less favorably than Torres, his Hispanic coworker, despite conceding that Torres was also required to complete the second, weeklong course. Ex. 9, Charge; Ex. 1, Scott Dep. 43:14-18, 81:9-12.

27. The EEOC dismissed Scott's charge with a no cause finding on August 7, 2018, finding it was unable to conclude that UPS's conduct violated any applicable statutes. Ex. 21, Dismissal. Scott then filed suit against in the Circuit Court of the Thirteenth Judicial Circuit, Hillsborough County, Florida, on May 10, 2019, and UPS removed this case to the Middle District of Florida, Tampa Division, where it is now pending. *See generally* Dkt. No. 1.

28. In his sworn testimony, Scott agrees that his charge of discrimination and Complaint "accurately and thoroughly" set forth all grounds on which he believes UPS discriminated or retaliated against him. Ex. 1, Scott Dep. 29:11-18. Scott also agrees that he has not suffered any discrimination or retaliation on any basis other than those specifically outlined in his charge and Complaint. *Id.* 29:19-2.

## IV. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment when, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While "[t]he moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact[,]" the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008); *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Ray*, 327 F. App'x at 825 (quoting *Celotex*, 477 U.S. at 322). "Speculation does not create a genuine issue of fact[,]" and, "if the nonmovant's response consists of conclusory allegations, summary judgment is not only proper, but required." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005); *MSPA Claims 1, LLC v. Infinity Auto Ins. Co.*, 344 F. Supp. 3d 1377, 1379 (S.D. Fla. 2018) (citing *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981)).

## V. MEMORANDUM OF LEGAL AUTHORITIES

### *A.* McDonnell-Douglas *Burden-Shifting Framework.*

Scott's race discrimination and retaliation claims alleged under the Florida Civil Rights Act are subject to the well-known *McDonnell-Douglas* burden-shifting framework. Under this framework, Scott must first meet his burden by establishing the *prima facie* elements of such claims by a preponderance of the evidence.[6] *Lawrence v. Ward*, 774 F. App'x 560, 562 (11th Cir. 2019) (noting claimant's summary judgment burden is to establish a *prima facie* case by a preponderance of the evidence standard). More specifically, Scott's FCRA race discrimination claim requires proof he (i) is a member of a protected class, (ii) was subject to an adverse employment action, (iii) was treated less favorably than similarly situated employees, and (iv) was qualified to perform his position. *Giles v. Daytona State Coll.*, 542 F. App'x 869, 872 (11th Cir. 2013). Meanwhile, a *prima facie* FCRA retaliation claim requires Scott prove by a preponderance of the evidence that (i) he engaged in an activity protected under the statute, (ii) he suffered an adverse employment action, and (iii) a causal connection existed between the protected activity

[6] The FCRA is Florida's state law analog to Title VII. Accordingly, "precedent interpreting Title VII applies to claims arising under the FCRA." *Forbes v. City of North Miami*, 509 F. App'x 864, 867 (11th Cir. 2013); *see also Thompson v. Baptist Hosp. of Miami, Inc.*, 279 F. App'x 884, 888 (11th Cir. 2008) ("The FCRA, which is patterned after Title VII, [is] analyzed using the same framework as Title VII claims and Title VII precedent.")

and the adverse employment action. *Bourne v. Sch. Bd. of Broward Cty.*, 508 F. App'x 907, 910 (11th Cir. 2013).

If Scott successfully meets his *prima facie* burden, the burden shifts to UPS to articulate a legitimate, non-discriminatory reason for the challenged actions. *Lawrence,* 774 F. App'x at 563. Once UPS meets this burden of production, any "presumption of discrimination disappears …" *Powell v. Am. Remediation & Envtl., Inc.*, 618 F. App'x 974, 978 (11th Cir. 2015). At that point, the burden shifts back to Scott to "prove, again by a preponderance of the evidence, that the proffered reason was a mere pretext for discrimination." *Lawrence*, 774 F. App'x at 563. Should Scott fail to meet this ultimate burden and establish pretext by a preponderance of the evidence, summary judgment and dismissal with prejudice is warranted.

### *B. Scott Cannot Establish* **Prima Facie** *Race Discrimination Claim.*

Scott first alleges that he suffered race discrimination *vis a vis* the assignment of driving routes during the 2017 peak season, being required to complete the five-day training course, and his disqualification from that weeklong program. Scott, however, cannot establish a *prima facie* claim on any of these grounds, because he cannot prove by a preponderance of the evidence that (i) he was treated less favorably than similarly situated individuals or (ii) his alleged comparators engaged in "nearly identical" misconduct or committed similar policy violations.

#### 1. Scott Not Treated Less Favorably than Similarly Situated Individuals.

First, Scott's FCRA race discrimination claim requires he prove he was treated less favorably than non-Black employees. *Giles*, 542 F. App'x at 872. In support of this claim, Scott alleges that Victor Torres, an employee of Hispanic descent, received more favorable treatment and was allowed "to begin driving" before him. *See* Dkt. No. 1, Pl.'s Compl. at ¶ 10; *see also* Ex. 9, Charge (alleging Torres received more favorable treatment); Ex. 1, Scott Dep. 156:12-18.

However, the undisputed summary judgment evidence shows that Torres hardly received more favorable treatment; instead, the record proves Torres and Scott were treated ***identically***. As a threshold matter, Scott and Torres both have seniority dates of January 4, 2012.[7] Ex. 7, Sanchez Decl. ¶ 6; Ex. 3, Dore Decl. ¶ 12; Ex. 22, Torres EHP; Ex. 2, Scott EHP. Furthermore, the record reflects that Torres and Scott were treated identically throughout both the 2017 peak season and when trying to qualify as full-time Package Car Drivers in 2018. For example, Scott readily admits that both he and Torres were required to attend an abbreviated, local three-day training course before they could work in peak season driving positions:

> Q. Did anybody else from the Bayside Center attend that three day training course with you in 2017?
> A. Yes, sir.
> Q. Who else attended that class?
> A. Victor Torres.

Ex. 1, Scott Dep. 43:14-18. Despite Scott's suggestion that Torres was improperly allowed "to begin driving" before him (*see* Dkt. No. 1, Pl.'s Compl. at ¶ 10), the record evidence also proves that both employees attended the same training course, obtained their DOT cards on the same day, and began driving on a part-time basis during the 2017 peak season. Ex. 5, Teimer Decl. ¶ 9; Ex. 2, Scott EHP; Ex. 22, Torres EHP. In fact, Scott specifically admits he worked as a Driver on at least twelve days during the month of December 2017, despite initially only bidding on a Saturday Air route. Ex. 9, Charge; Dkt. No. 1 at ¶ 20; *see also* Ex. 8, Scott Payroll History Reports (reflecting work performed at driver rate of pay in December 2017). In short, the suggestion that Torres was permitted to drive before Scott, or received more favorable treatment than him, are categorically false

[7] Scott alleges, without any basis, that UPS supposedly modified Torres' seniority date at some unknown point in time. However, UPS's personnel records reflect that Torres completed his thirty day probationary period and obtained seniority on January 4, 2012, the same as Scott. Ex. 7, Sanchez Decl. ¶ 6; Ex. 5, Teimer Decl. ¶ 9.

Faced with this indisputable evidence, Scott offers only bald, conclusory allegations that Torres was somehow given preferential treatment with regard to peak season driving assignments. Even if this would be sufficient to state a discrimination claim[8], Scott nonetheless lacks the slightest competent evidence showing Torres received more favorable treatment in this regard. *See Wigfall v. St. Leo Univ., Inc.,* No. 8:10-cv-02232, 2012 WL 717868, at *4 (M.D. Fla. Mar. 6, 2012) (a plaintiff's mere subjective beliefs, speculation, or conclusory assertions" are insufficient to establish a viable discrimination claim). Thus, Scott's allegation that he was denied driving work during the 2017 peak season, or that Torres was improperly permitted to perform such work to his detriment, is both baseless and conclusively contradicted by the summary judgment record.

Scott next alleges he suffered discrimination by having to attend the weeklong Integrad course in January 2018. Scott specifically claims it was "unusual" that he would be required to attend this weeklong course, despite having previously completed an abbreviated peak season course. Dkt. No. at, Pl.'s Compl. at ¶ 15. This unfounded allegation is directly contradicted by the record evidence, which shows that all full-time candidates were required to complete the weeklong training course, even if they had previously completed an abbreviated local course. Ex. 5, Teimer Decl. ¶ 15; Ex. 3, Dore Decl. ¶ 13. Scott further admits that, rather than receiving more favorable treatment than him, Torres was also required to attend the weeklong course along with him. Ex. 1, Scott Dep. 57:21-23 (admitting Torres also completed local three-day course in 2017), 81:9-12 (admitting Torres was required to attend second course in January 2018).

---

[8] To the extent Scott claims he suffered discrimination based on the mere assignment of individual driving routes, these scheduling issues would not rise to the level of an "adverse employment decision," as is required to state a *prima facie* FCRA race discrimination claim. *See Reis v. Universal City Develop. Partners, Ltd.*, 442 F. Supp.2d 1238, 1254 (M.D. Fla. 2006) (citing *Craven v. Tex. Dept. of Crim. Justice*, 151 F. Supp.2d 757 (N.D. Tex. 2001)) (noting that disagreements regarding shift assignments and "difference in working hours, alone, is not sufficient" to establish an adverse employment action).

As such, Scott fails to prove he received less favorable treatment than Torres and, in fact, tacitly admits he and his alleged comparator received identical treatment. Summary judgment should therefore be granted on this basis alone. *See Smith v. Mobile Shipbuilding & Repair, Inc.*, 663 F. App'x 793, 799 (11th Cir. 2016) (granting summary judgment and dismissing race discrimination claim where claimant "failed to show that he … received less favorable treatment than a similarly situated person outside his protected class").

**2. No Evidence Comparators Engaged in "Nearly Identical" Misconduct.**

Like many other Circuits, the Eleventh Circuit strictly construes the "similarly situated" comparator analysis. To be "similarly situated" and serve as comparators, the coworkers at issue must have engaged in misconduct that is "nearly identical" to that of the claimant. *Cuevas v. Am. Express Travel Related Servs. Co., Inc.*, 256 F. App'x 241, (11th Cir. 2007). In its own words, the Eleventh Circuit "require[s] the quantity and quality of the comparator's misconduct [to] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Brown v. Jacobs Engineering, Inc.*, 572 F. App'x 750, 752 (11th Cir. 2014). Thus, even if a claimant and comparator are similar in "some respects, differences in their overall record may render them not 'similarly situated' for purposes of establishing a *prima facie* case." *Id.*

In this case, Scott fails to meet his burden and cannot show that Torres or any other alleged comparator engaged in "nearly identical" misconduct—*i.e.*, violated the Appearance Guidelines on at least three days of Integrad training. It is undisputed that Scott was disqualified from Integrad training in January 2018 after he failed three consecutive uniform inspections. Ex. 12, Freiwald Decl. ¶ 5; Ex. 11, Teresi Decl. ¶¶ 7-8; Ex. 18, Freiwald Memo. The undisputed evidence also shows that although Torres had Appearance Guidelines violations on the first two days of training,

by the third day he had remedied all such issues. Ex. 18, Freiwald Memo; Ex. 12, Freiwald Decl. ¶ 5. Meanwhile, Scott admits he lacks knowledge of ***any other employee's uniform compliance*** and cannot speculate as to such. Ex. 1, Scott Dep. 110:6-10. Very simply, the record shows Torres completed all cited uniform issues, meaning his circumstances were materially different and not "similarly situated" to that of Scott. Indeed, Torres and Scott were held to precisely the same standard, the only difference between them being that where Torres brought his uniform and appearance into compliance within three days, Scott did not.

Faced with this undisputed evidence, Scott offers nothing more than bald, unsupported claims that Torres received preferential treatment. However, "unverifiable, anecdotal testimony from [claimant's] coworkers and from his own experience of isolated incidents" is not competent summary judgment evidence and cannot create a fact issue. Thus, Scott's wholesale lack of evidence regarding his alleged comparators' misconduct dooms his unsupported accusations, because the court should "not consider … as a comparator" individuals for whom "plaintiff admitted in his deposition that he has no personal knowledge." *Horn v. United Parcel Serv., Inc.*, No. 3:08-00953, 2010 WL 11507196, at *3 (M.D. Fla. July 20, 2010). Scott simply cannot prove Torres engaged in "nearly identical" misconduct and fails to establish this element of his claim.

### ***C. Scott Cannot Establish*** **Prima Facie** ***Retaliation Claim.***

Scott next alleges he suffered unlawful retaliation in violation of the FCRA. Critically, Scott's ***only*** alleged protected activity occurred when he supposedly filed a grievance during the 2017 peak season, alleging he was supposedly denied the opportunity to work as a Driver.[9] Dkt.

[9] Scott claims he filed a grievance under UPS's CBA in December 2017, complaining that he had supposedly been denied the opportunity to work as a Driver. Ex. 1, Scott Dep. 34:22-35:6. However, UPS's labor records do not reflect that the Union tendered any such grievance on behalf of Scott, nor did Scott produce such a grievance during discovery in this lawsuit. Ex. 3, Dore Decl. ¶ 11. Consequently, Scott has failed to show he made ***any*** complaint during this time period at all, let alone a "protected" complaint covered by the FCRA. Nonetheless, for the purposes of this Motion, UPS assumes *arguendo* that Scott asserted a driving-related complaint or grievance, as he alleges.

No. 1, Pl's Compl. at ¶ 25; Ex. 1, Scott Dep. 34:22-35:6. Scott then alleges that he suffered retaliation by having to attend, and being disqualified from, the weeklong Integrad course. Dkt. No. 1, Pl.'s Compl. at ¶ ¶ 25-26. However, Scott cannot prove this retaliation claim by a preponderance of the evidence, because (i) he did not engage in conduct protected by the FCRA and (ii) the Integrad decision-makers were completely unaware of his alleged 2017 grievance.

**1. Scott Did Not Engage in Protected Activity.**

First, Scott did not engage in statutorily protected activity, because his alleged 2017 complaint did not complain of race discrimination. Ex. 5, Teimer Decl. ¶ 12; Ex. 3, Dore Decl. ¶ 11. Instead, Scott merely told Teimer that he also wished to deliver Ground packages, as Torres and Moultin had been approved to do, without any reference to his or these other individuals' races. Ex. 15, Teimer Decl. ¶ 11. Because this complaint pertained to general workplace issues and driving assignments, it did not bear on any employee's "protected" characteristics and cannot serve as the foundation of a statutory retaliation claim.

This court was recently presented with a nearly identical situation in *Ceus v. City of Tampa*, No. 8:16-cv-1513, 2018 WL 10140155 (M.D. Fla. Jan. 8, 2018). In *Ceus*, the claimant alleged that he engaged in protected activity when protesting a 2014 performance evaluation. *Id.* at *9 (Hon. Honeywell, C. presiding). The Court, however, noted that while this performance-related discussion was contentious, none of the underlying complaints invoked issues of "race or discrimination." *Id*. On that basis, the Court granted summary judgment on the retaliation claim. *Id.* On appeal, the Eleventh Circuit affirmed that Title VII is not "a civility code" nor is it intended to protect individuals from "petty slights or minor annoyances that are common in the workplace …" *Ceus v. City of Tampa*, 803 F. App'x 235, 247 (11th Cir. 2020). The Eleventh Circuit instead held that generalized workplace disagreements and arguments "wholly unrelated to race" are beyond the scope of Title VII, and therefore affirmed this Court's dismissal of that claim. *Id.* Like

the claimant in *Ceus*, Scott at most made generalized work assignment complaints, unrelated to race or other protected characteristics, and as such failed to engage in activity protected by the FCRA. *See also Valdes v. Miami-Dade College*, 463 F.App'x 843, 846-47 (11th Cir. 2012) (list of "workplace complaints" is not protected, granting summary judgment on retaliation claim).

**2. Scott Cannot Prove the Required "Causal Connection."**

Scott's next fails to prove a "causal connection" exists between his alleged 2017 complaint and the complained of decisions, barring him from establishing a *prima facie* retaliation claim.

First, Scott was not compelled to attend the Integrad course due to any individual's subjective decision but, instead, because such attendance was mandated by company policy. As explained herein, UPS policy required ***all*** full-time Driver candidates to complete an intensive, weeklong training course. Ex. 5, Teimer Decl. ¶ 15; Ex. 3, Dore Decl. ¶ 13. On this basis alone, Scott cannot show that his attendance at the Integrad course was the result of any individual's retaliatory *animus* or intent and fails to establish a "causal connection" on this basis alone. *See, e.g., Johnson v. Gestamp Ala., LLC*, 946 F. Supp.2d 1180, 1207-1208 (N.D. Ala. 2013) (claimant failed to establish requisite "causal connection" when undisputed evidence demonstrated adverse action was compelled by company policy).

Scott also cannot establish any "causal connection" between his alleged grievance and his disqualification from Integrad training, because the Lake Mary instructors were ***completely unaware*** of Scott's alleged grievance. To meet his burden and establish a "causal connection," Scott must necessarily present evidence that the individuals who disqualified him from training were aware of his underlying complaints. In other words, "a decision-maker cannot have been motivated to retaliate by something unknown to him." *Mitchell v. Mercedes Benz U.S. Int'l, Inc.*, 637 F. App'x 535, 539 (11th Cir. 2015); *see also Walton-Horton v. Hyundai of Ala.*, 402 F. App'x

405, 409 (11th Cir. 2010) (claimant unable to show causal connection if the decision-makers were "unaware of the protected activity at the time [they] recommended" the contested decision).

It is undisputed that the Lake Mary Integrad facility is operated independently from UPS's package centers—including the Bayside Center at which Scott works—and is staffed with its own management personnel. Ex. 11, Teresi Decl. ¶¶ 2-3, 10. Further, the undisputed summary judgment record proves that none of the Lake Mary Integrad instructors had any knowledge of Scott's prior grievances or complaints within the Bayside Center. Ex. 12, Freiwald Decl. ¶ 6; Ex. 11, Teresi Decl. ¶ 10. Because this fact is undisputed, Scott cannot show a "causal connection" as to his disqualification from Integrad training, as a matter of law. *See, e.g., Manigault v. Soc. Security Admin.*, 609 F. App'x 982, 986 (11th Cir. 2015) (because decision-maker "was not aware of … complaint at the time she made the decision, [claimant] cannot show the requisite causal link between the statutorily protected conduct and the adverse employment action").

### *D. UPS Presents Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for All Complained-Of Decisions, and Scott Fails to Show Such Reasons are Pretextual.*

As explained above, Scott's FCRA race discrimination and retaliation claims should be dismissed with prejudice, as he is unable to establish even a *prima facie* case for each. However, even if the Court indulged Scott and proceeded with its burden-shifting analysis, summary judgment remains appropriate. In particular, UPS presented legitimate, non-discriminatory and non-retaliatory reasons for (i) the assignment of driving work during the 2017 peak season and (ii) Scott's attendance and disqualification from the January 2018 Integrad training.

First, UPS has explained that Scott and other employees with requisite seniority were permitted to drive as Air Drivers during the 2017 peak season. Ex. 6, Bid List; Ex. 5, Teimer Decl. ¶¶ 8-11. The CBA dictates that such positions are awarded based on seniority, and these rules were followed insofar as Scott was permitted to work as a Driver on twelve days during the month

of December 2017. Ex. 9, Charge; Ex. 5, Teimer Decl. ¶ 8, 11; Ex. 3, Dore Decl. ¶ 10; Ex. 8, Pay History Report. Thus, because the CBA and the company's seniority rules dictated the manner in which such Driver work would be awarded, and UPS complied with those rules, UPS has necessarily articulated a legitimate, non-discriminatory and non-retaliatory basis for the assignment of driving work during the 2017 peak season. *See Jolibois v. Fla. Int'l Univ.*, 654 F. App'x 461, 462-63 (11th Cir. 2016) (actions "based on provisions in a Collective Bargaining Agreement" are presumptively legitimate and non-discriminatory).

Second, UPS has explained that Scott and other full-time candidates were required to complete a five-day training course as a prerequisite to that promotion. Ex. 5, Teimer Decl. ¶ 15; Ex. 3, Dore Decl. ¶ 13. The requirement that Scott attend the Integrad course was therefore (i) mandated by a facially neutral company policy and (ii) applied to Scott and employees of all other races, including Torres. Ex. 5, Teimer Decl. ¶ 15; Ex. 3, Dore Decl. ¶ 13. UPS has also explained that Scott was disqualified from the Integrad training course after failing uniform inspections on three consecutive days, despite repeated warnings. Ex. 11, Teresi Decl. ¶¶ 7-8; Ex. 18, Freiwald Memo.; Ex. 12, Freiwald Decl. ¶ 5. Accordingly, UPS has articulated non-discriminatory, non-retaliatory reasons for both the requirement to attend the Integrad course, and Scott's disqualification from this course. *See Jolibois*, 654 F. App'x at 462-63 (violations of neutral employment policies is a legitimate, non-discriminatory reason for adverse employment decisions); *see also Zedeck v. Target Corp.*, No. 07-60364, 2008 WL 2225661, at *3 (S.D. Fla. May 29, 2008) (violations of company dress code constituted legitimate basis for decision).

UPS having articulated a legitimate reason for the decisions complained of by Scott, he must prove, by a preponderance of the evidence, that each these explanations are pretextual. *Ceus v. City of Tampa*, No. 18-10484, 2020 WL 525559, at *5 (11th Cir. Feb. 3, 2020). To meet this

ultimate Burden, Scott must "show that the proffered reason really is a pretext for unlawful discrimination" and "produce sufficient evidence to allow a reasonable finder of fact to conclude that the employer's articulated reasons were not believable." *Id.*

Scott, however, cannot meet this heavy burden. Instead, Scott merely complains that the Appearance Guidelines were applied in a "military type fashion" at the Integrad site, which he believes was unfair. Dkt. No. 1, Pl.'s Compl. at ¶ 16. Nonetheless, Scott ***does not dispute*** that he failed these inspections on three consecutive days, unlike Torres, and Scott lacks any evidence that the standards were applied more strictly as to him than his coworkers. Thus, the facts leading to Scott's disqualification are both not in dispute, and Scott cannot show that racial or retaliatory prejudice in any way motivated that decision. Instead, Scott simply believes it was unfair that he was disqualified on these grounds. An employee's mere subjective belief he was treated unfairly is insufficient to show pretext, however. *See, e.g., Monds v. Quitman, Georgia*; 767 F. App'x 750, 765 (employee's "unsupported subjective belief" insufficient to establish pretext).

More importantly, Scott admits that ***none*** of the UPS management personnel involved in this case have ever uttered a critical, negative, or pejorative comment regarding his race. Ex. 1, Scott Dep. 21:23-25:9, 93:5-13. Scott consequently lacks the slightest evidence or basis on which to suggest—let alone begin to prove—that racial or retaliatory *animus* was the "real" reason for any of the decisions he complains of in this lawsuit. *See Mitchell v. First Transit, Inc.*, No. 3:15cv529, 2017 WL 4229053, at *3 (N.D. Fla. Aug. 8, 2017) (concluding claimant failed to show pretext, in part, because there was no evidence any management personnel "made any statement that was derogatory or negative with regard to her (or anyone else's) race …").

In short, UPS's decisions affecting Scott have been supported by company policy and applied in equitable, non-discriminatory, non-retaliatory manner. Scott lacks even the slightest

evidence of pretext and, if the Court proceeds with its full burden-shifting analysis, summary judgment should be granted.

## VI. CONCLUSION

Rather than suffering discrimination or retaliation, the undisputed evidence shows Scott has consistently benefitted from opportunities to seek advancement during his employment with UPS. Scott admits he was permitted to work as an Air Driver during the 2017 peak season and, shortly thereafter, that he was permitted to seek a full-time Driver promotion. Scott also admits that his alleged comparator, Torres, was treated identically to him at every turn: being permitted to drive during 2017's peak season but, later, having to attend a weeklong training course before receiving a full-time promotion. And, it is undisputed that Scott failed to comply with the Appearance Guidelines on three consecutive training days, failed three consecutive uniform inspections, and was consequently disqualified from training. Very simply, Scott's testimony and circumstances fail to show that he has been subject to any mistreatment at all.

For these reasons and the other arguments set forth in the foregoing Motion, Scott's claims under the FCRA should be dismissed, because he fails to establish even a *prima facie* claim by a preponderance of the evidence. Furthermore, UPS has explained its legitimate, non-discriminatory and non-retaliatory reasons for the challenged decisions, and Scott fails to meet his burden of proving such explanations are pretextual. UPS respectfully requests the Court grant this Motion for Summary Judgment, dismiss Scott's claims with prejudice, and for all other relief to which it may be entitled.

Respectfully submitted,

*/s/ Justin Barbour*

J. Scott Hudson, Esq.
Fl. Bar No. 0725137
Zimmerman, Kiser & Sutcliffe, P.A.
315 E. Robinson St., Suite 600
P.O. Box 3000
Orlando, FL 32802
PH: (407) 425-7010
FX: (407) 425-2747
shudson@zkslawfirm.com

-and-

Justin Barbour (*Admitted Pro Hac Vice*)
Texas State Bar No. 24055142
jbarbour@sr-llp.com
Schmoyer Reinhard LLP
8000 IH 10 West, Suite 1600
San Antonio, Texas 78230
PH: (210) 447-8033
FX: (210) 447-8036

**ATTORNEYS FOR DEFENDANT UNITED PARCEL SERVICE, INC. (OHIO)**

**CERTIFICATE OF SERVICE**

*I Hereby Certify* that on ***December 10, 2020***, I electronically filed the foregoing with the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Justin Barbour
Justin Barbour

**SERVICE LIST**

Jerry Girley
Florida Bar No. 35771
The Girley Law Firm, P.A.
117 East Marks Street, Suite A
Orlando, Florida 32803
Telephone: 407-540-9866
Fax: 407-540-9867
Email: phyllis@thegirleylawfirm.com

*Counsel for Plaintiff*