# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARIO SCOTT *
*
*
VS. * Case No.:
* 8:19-cv-1363-T-36SPF
*
UNITED PARCEL SERVICE *

*****************************************************

ORAL DEPOSITION OF
MARIO SCOTT
JULY 27, 2020
(Reported Remotely)

*****************************************************

ORAL DEPOSITION of MARIO SCOTT, produced as a witness at the instance of the Defendant, and duly sworn, was taken remotely in the above-styled and numbered cause on the 27th day of July, 2020, between the hours of 8:57 a.m. and 1:03 p.m., before TRICIA FOX WILLIAMS, CSR, in and for the State of Texas, reported by machine shorthand, at the residence of Mario Scott, 11332 Grandville Drive, Tampa, Florida, in accordance with the Federal Rules of Civil Procedure, State of Texas 18th Emergency Order Regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto.

THE REPORTER: Pursuant to Texas' 18th Emergency Order Regarding the COVID-19 State of Disaster, sections 3(c) and (d), this deposition of Mario Scott is being conducted remotely via RemoteDepo. Today's date is July 27th, 2020, and the time is 8:57 a.m., the witness is located at 11332 Grandville Drive, Tampa, Florida. My name is Tricia Williams, Texas CSR No. 8273, I am administering the oath and reporting the deposition remotely by stenographic means from my residence in New Braunfels, Texas. I will now swear in the witness.

MARIO SCOTT,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. BARBOUR:

Q. Good morning, Mr. Scott.

A. Good morning.

Q. Could you please state and spell your name for the record, sir.

A. Mario Scott, M-A-R-I-O-S-C-O-T-T.

Q. Mr. Scott, my name is Justin Barbour, and do you understand that I am an attorney who represents United Parcel Service?

A. Yes, sir.

Q. You and I have never met or spoken prior to

Q. And is UPS your current employer?
A. Yes, sir.
Q. What position do you hold with UPS as of today?
A. Full-time package car driver, 22.4 I believe is the actual name.
Q. And how long have you been classified as a full-time package car driver?
A. Let's see, officially, January of 2020.
Q. And do you remember when you began your employment with UPS?
A. Yes, sir. October of 2011 was when I first started.
Q. Were you first hired as what UPSers would call a peak season employee?
A. I was hired in a peak season time, yes, sir, and I officially was hired in 2012 in January.
Q. And I almost spoke over you right there, and I apologize for that, I'll try and keep your transcript clean, but your seniority date would be in January of 2012, wouldn't it?
A. Yes, sir.
Q. And I think it was your testimony that that was the date when you became a permanent employee of UPS versus having been a temporary peak season employee in late 2011; is that correct?

UPS?

A. Yes. For the whole two years I would work part-time at UPS in the morning, and Dillard's after I leave.

Q. Did you leave employment with Dillard's voluntarily or involuntarily, as best you can remember?

A. Voluntary.

Q. And what were your reasons for leaving work with Dillard's, Mr. Scott?

A. I wanted to get into the training field, I left there and went to LA Fitness.

Q. Mr. Scott, I want to talk about your current employment with UPS in a bit more detail. You had said that, as of today and as of earlier in 2020, you were a full-time article 22 package car driver; is that correct?

A. Say that one more time, I'm sorry.

Q. Yes, sir. For approximately the last six or seven months in your employment with UPS, you've been a full-time package car driver; is that correct?

A. Yes, sir.

Q. What center do you drive out of?

A. Tampa Bayside.

Q. And is the Bayside Center the only center that you've ever worked out of during your employment with

UPS?
A. Yes, sir. I've trained at different locations, but I only worked out of one.
Q. And so that would include your time period as a part-time employee, you were a part-timer at Tampa Bayside as well; is that correct?
A. Yes, sir.
Q. Who is the current center manager in the Tampa Bayside Center, Mr. Scott?
A. Tom Teimer.
Q. Do you know approximately how long Mr. Teimer has been the center manager in the Bayside Center?
A. No, sir.
Q. During the course of your deposition today we're going to talk about the peak season in 2017, when I understand you feel like you were not given a chance to perform some driver functions, your disqualification from driving school in early 2018, and some of those events that I think make up your claims in this lawsuit. For your purposes, my question, Mr. Scott, is has Tom Teimer been the center manager of the Bayside Center during the time periods where you feel like you've been mistreated or discriminated against during your employment with UPS?
A. Yes, sir.

Q. And who are the current on road supervisors in the Bayside Center, Mr. Scott?
A. Justin Drew and Marvin McGruder.
Q. What was Marvin's last name, Mr. Scott?
A. McGruder, I believe.
Q. Now, as I understand it you are claiming that you've suffered certain acts that you think are racially discriminatory during your employment with UPS; is that correct?
A. Yes, sir.
Q. For the sake of our record, Mr. Scott, because all of this is being written down on paper only, what is your race, what do you consider your race to be, Mr. Scott?
A. Black, African-American.
Q. And Mr. Teimer, do you know what Mr. Teimer's race is?
A. He's a white male.
Q. And what about Mr. Drew and Mr. McGruder, what are their races for the sake of our record?
A. Justin Drew is a white American, and Marvin McGruder is a black, African-American.
Q. During the course of your employment with UPS, Mr. Scott, have you ever heard Tom Teimer use a term that you would deem to be a racial slur, or anything

that's racially derogatory, whether with regard to yourself or whether with regard to anyone else?
A. Say that one more time, sir, I'm sorry.
Q. Yes, sir. At any point have you heard Mr. Teimer use a term that you considered to be a racial slur, or a word that you consider to be racially derogatory?
A. No, sir.
Q. And what about Mr. Drew, have you heard Mr. Drew use any words that you would consider to be racial slurs, or racially derogatory, whether with regard to you, or whether with regard to anyone else?
A. Other than telling me how far -- Justin Drew explained to me how he believed I was going to fall on my face, I don't know what he meant by that.
Q. Okay. As I understand it, Mr. Drew at one point told you -- or you said something about falling on your face. What do you recall Mr. Drew telling you in this one instance?
A. He told me, I don't remember exactly the statement off the top of my head, I have it wrote down, but he told me that when I was attempting to qualify, that he believed I would fall on my face.
Q. Okay. When you say qualify, you mean qualify to be a full-time package car driver?

A. Yes, sir.
Q. You said -- did you say you have this written down somewhere?
A. Yes, sir, I put it in a grievance before, I believe.
Q. So when you say, "I have it written down," you're referring to a grievance that you filed with the union; is that correct?
A. Yes, sir.
Q. You've been to what we would call service provider training at least a couple times; is that correct, Mr. Scott?
A. Three times total.
Q. When Mr. Drew said he felt like you would fall down on your face, do you know whether that was before the first, the second, or the third period that you went to service provider training?
A. It was after the first school.
Q. So before the second school; is that correct?
A. That I don't remember right now, sir, the time line exactly.
Q. That's fair. We're talking about events that happened two to two and a half years ago, Mr. Scott, but you do recall he said it after the first school, the first time you went to service provider training; is

that correct?
    A. Yes, sir, it was definitely after the first school.
    Q. Did you think that there was something Mr. Drew was saying about your race as a black African-American when he said, "I think you're going to fall down on your face"?
    A. A lot of things came to mind, but I don't know exactly what Mr. Drew meant by that.
    Q. And that's the only instance when he said something that you felt could be racially insensitive, a racial slur, otherwise improper on the basis of race; is that right?
    A. Yes, sir.
    Q. And then Mr. McGruder, you said that he's a black African-American male also; is that correct?
    A. Yes, sir.
    Q. Have you ever heard him use anything that you would consider to be a racial slur, or racially derogatory whether with regards to you, or to anyone else in the center?
    A. Well, he told me to forget about my family for 30 days, and that definitely concerned me as well, but I'm not sure what Mr. McGruder meant by that.
    Q. When he said, "Forget about your family for 30

days," what was the context in which he said that?
A. When I was attempting to once again qualify, and I was wondering why I wasn't being put on the road to be able to qualify.
Q. And did he say anything other than "Forget about your family for 30 days," or is that the extent of what you recall him saying?
A. That's pretty much the extent that I can really remember, that really stuck out the most.
Q. As a full-time package car driver, you're a member of UPS's union, aren't you, Mr. Scott?
A. Yes, sir.
Q. Do you recall -- you were also a member of the union when you were a part-time employee at UPS, weren't you, Mr. Scott?
A. Yes, sir.
Q. As a member of the union, the company's collective bargaining agreement controls many of the terms and conditions of your employment with the company, doesn't it?
A. Yes, sir.
Q. Do you have a copy of the CBA?
A. Yes, sir. Not in front of me, no.
Q. I'm sorry, what was that, Mr. Scott?
A. I don't have one in front of me, if that's what

screen. What I'm showing you now is what I'm going to mark as Exhibit 1 to your deposition, which is a copy of your complaint that was filed on your behalf in this lawsuit, do you understand that?

(Exhibit 1 marked for identification.)

A. Yes, sir.

Q. (By Mr. Barbour) And I'll represent to you that Mr. Girley, your attorney, filed this complaint on your behalf, does that match your recollection?

A. Yes, sir.

Q. Have you reviewed your complaint that was filed in this lawsuit prior to today?

A. In the past, yes.

Q. And when you reviewed your complaint, did you feel like the complaint accurately and thoroughly set out what you believed your claims were against UPS in this lawsuit?

A. Yes, sir.

Q. And we're going to spend, like I said, we're going to spend some time talking through the details of your claims against the company here today, but when you reviewed the complaint that's Exhibit 1, did you feel like there were any claims or any allegations in your reasons that you felt UPS had discriminated or retaliated against you that weren't set out in that

complaint?
A. No, sir.
Q. To make it a little easier on your end, Mr. Scott, I'm going to stop sharing my screen now, because I'm done with Exhibit 1; is that fair, sir?
A. Yes, sir.
Q. Just because I think it allows us to see each other a little bit better when the screen sharing is off. And I'll represent to you that these are the issues that wouldn't be a problem if we had taken the deposition prior to the pandemic, but I appreciate that. You were a part-time employee in the Tampa Bayside Center for several years after 2012; is that correct?
A. Yes, sir.
Q. And, specifically, were you a preloader as a part-time?
A. I started off as a loader, and I moved to a unloader.
Q. What shift were you working in the Tampa Bayside Center as a part-time employee?
A. The early a.m.
Q. Could you say that again, Mr. Scott?
A. The early a.m.
Q. The early a.m. shift. Approximately what hours did the early a.m. shift cover?

A. It depends on the time of the year, but on average, anywhere from 3:00 to 9:00 a.m.

Q. And were you working five days a week in that position?

A. Yes, sir.

Q. And was it always your goal to try and move into a full-time position with UPS, or was that a decision you made later in your time with the company?

A. It was always a goal of mine.

Q. And did you speak with anyone about what the process was to bid for a full-time position with UPS?

A. Yes, sir.

Q. Who did you speak with, Mr. Scott?

A. Started in union representatives and the HR personnel, Desiree Garcia.

Q. Okay. Is Ms. Garcia an HR supervisor in the Tampa area?

A. She was -- I'm not sure her exact title, but she was definitely the HR representative for Bayside location.

Q. She was somebody from HR that you knew you could speak with if you had any questions or concerns; is that fair to say?

A. Yes, sir.

Q. What did the union representative and

Ms. Garcia tell you you should do if you wanted to try and obtain a full-time position with UPS?

A. Well, the union representatives made me aware of the bidding process, and where the sheets were to sign my name. And then I would go to Desiree and ask her where I was at on the seniority list, and when they will be hiring the next group of drivers prior to it becoming my time -- my seniority came up to become a driver.

Q. And did you specifically want a full-time driver position, or were there other full-time positions, such as 22.3 position that you would accept, or were you looking specifically at a driver position?

A. Specifically at a driver position. A 22.3, they weren't around at the time I was trying to become a driver.

Q. Fair point. So you knew where the bid lists were to go, frankly, sign up if you wanted to bid for that full-time position; is that correct?

A. Yes, sir.

Q. I'm going to share my screen again, Mr. Scott, and I'm going to open what I will mark as Exhibit 2 to your deposition.

(Exhibit 2 marked for identification.)

Q. (By Mr. Barbour) And this is a seven page

A. Just as the title says, air driver. So the air drivers, they deliver air packages that are next day air packages that typically have to be delivered by 10:30 a.m. Monday through Friday, and Saturdays by 12:00 p.m. So it's about hour and a half, maybe two hours at most of work per day.

Q. Air drivers aren't running a full eight or nine and a half hour route; is that fair to say?

A. No, they shouldn't.

Q. Okay. And air drivers, is that a full-time position, or is that still a part-time position?

A. It's a part-time.

Q. This document that I'm looking at, the bid list from 2016, which is pages one and two of Exhibit 2, do you believe you suffered any discrimination on the basis of your race or otherwise by virtue of this bid in December of 2016?

A. 2016. If that's the same document where Victor Torres had signed off, so if that's the same bid that they went off of to pick the drivers in 2017, then yes, sir.

Q. Okay. I don't see Mr. Torres's name on this document. So you're telling me that -- strike that. The first time you felt like you suffered discrimination on the basis of your race with UPS, was that when

Mr. Torres got to perform some work as an air driver, and you claim that you were not allowed to do so?

A. I'm not sure. He was actually driving full-time, although he may have been under the air driver title, but I know he was driving full-time every day when I filed my grievance.

Q. I'm going to go to page three of Exhibit 2 now, Mr. Scott, and I'm going to the second page of this bid list. And, again, I don't see Mr. Torres's name on this bid list, but I'm going to zoom in on this page four of Exhibit 2. And is that, again, your name and your signature there on this page?

A. Yes, sir.

Q. And now I'm going to go to the last set of bid lists that is going to make up this Exhibit 2, and this is page five of Exhibit 2. Up at the top of the document, I'm going to zoom in, do you see where it says, "date posted 9/19/17"?

A. Yes, sir.

Q. And then below that it says, "date removed 10/3/17;" is that correct?

A. Yes, sir.

Q. And this document is titled, Bid List for Saturday Air Driver, do you see that?

A. Yes, sir.

Q. And I am going to zoom in, it does look like Mr. Torres, that's Victor Torres, correct?
A. Yes, sir, that's his name.
Q. Is that his name and his signature there on page five of Exhibit 2?
A. Yes, sir.
Q. And then I'm going to scroll to page six of Exhibit 2, and zoom in on the very bottom of this document. And that is your name and your signature there at the bottom of page six; is that correct?
A. Yes, sir.
Q. And out to the right of that you've written your seniority date as 1/3 of 2012; is that right?
A. Yes, sir, that's what they were telling us at the time.
Q. And does that match your recollection of what your seniority date is, Mr. Scott?
A. I'm not sure, I'm kind of confused. I'm not sure if they moved it to the 4th of January or if it stayed the 3rd, but one of those dates, January 3rd or January 4th, 2012.
Q. Well, let me ask it this way, Mr. Scott: Do you have an opinion as to what your specific seniority date with UPS is?
A. At that time, I believed it to be January 3rd

Q. So to the extent that you've heard that Mr. Torres's seniority date was changed, that would have come just from speaking with Mr. Torres or with the union; is that correct?
A. As well as the bid sheet, I, like, seen it with my own eyes. And the whole time, like I said, I was talking to HR personnel to figure out exactly where I was at on the seniority list, and he was always behind me.
Q. When do you recall first getting put into an air driver position, Mr. Scott?
A. I believe at the end of 2017.
Q. Would that have been during the 2017 peak season?
A. Yes, sir.
Q. The ladies and gentlemen who might eventually sit on our jury in this case, they're not as familiar with UPS terminology and whatnot as you and I are I'm sure. So can you tell the ladies and gentlemen of the jury what peak season is in UPS nomenclature.
A. Peak season is the time between the end of October and January of the following year, around Christmas time, where the volume is extremely heavy and they tend to add more drivers, add more warehouse workers, and more hours to your daily work schedule.

Q. Everybody's got to pull a lot more weight, I guess, basically, to make sure that excess volume gets where it needs to go right before the holidays; is that correct?

A. Yes, sir.

Q. And I think you had mentioned, you know, that drivers work longer hours, more hub workers or more center workers are hired, and there are also occasions where people who aren't drivers at all have to hop in a package car and go deliver packages themselves; is that correct?

A. Yes, sir.

Q. And sometimes that includes people who don't even work in a center, you know, marketing and salespeople sometimes have to go drive during peak to make sure those packages get where they need to; is that correct?

MR. GIRLEY: Object to the form.

Q. (By Mr. Barbour) Mr. Girley may object, Mr. Scott. Unless he tells you not to answer the question, I would ask you to go ahead and do so.

A. I didn't get the question, I'm sorry.

Q. That's fair. In your experience with UPS during peak season, you've probably even seen marketing and salespeople, who don't normally work in a center at

available.

Q. Did you have to attend any kind of a training class before getting that air driver position in 2017?

A. Yes, sir.

Q. Was -- let me strike that. Was that a three day long training class you attended at that time?

A. Yes, sir.

Q. And was that class held in the Tampa center -- excuse me, the Bayside Center itself?

A. No, sir.

Q. Where was that class held?

A. I'm not sure the building name, but it was in Tampa.

Q. Did anybody else from the Bayside Center attend that three day training course with you in 2017?

A. Yes, sir.

Q. Who else attended that class?

A. Victor Torres.

Q. Did you have an understanding as to whether Mr. Torres was also moving into an air driver position at that time?

A. Yes, sir.

Q. And so was it your understanding that Mr. Torres also needed to complete that three day training course to work as a air driver during the 2017

Q. Have you given all documents relating to your claims in this lawsuit, including e-mails from that account, to Mr. Girley?
A. I'm sorry, I didn't hear the first part of that.
Q. Yes, sir. All documents within your possession, including e-mails from that Gmail account, have you given those documents to Mr. Girley, your attorney?
A. Yes, sir.
Q. Mr. Scott, I'm asking specifically now about that time you worked as a temporary air driver in 2017. Do you feel like you were treated unfairly because of your race at any point during that 2017 peak season?
A. Yes, sir.
Q. And in what way, Mr. Scott?
A. I believe that they discriminated against me when they allowed junior employee, Victor Torres, to become a driver, put him on the road before he put me on the road, he was a Hispanic male.
Q. Mr. Torres had completed that same three day training course as you; is that correct?
A. Yes, sir.
Q. Did another lady by the name of Johane Moultin attend that three day training course as well?

Q. Okay. You say initially. At some point you were allowed to work as an air driver then; is that correct?

A. Yes, sir. At some point at the end of 2017, after filing a grievance, I was allowed on the road, I believe the beginning of December, end of November.

Q. After you filed that grievance, did Mr. Teimer, or either of your supervisors, state why you hadn't been allowed to work as an air driver prior to that?

A. No, sir, not to me.

Q. Well, did anybody explain to you one way or another why you had or had not been allowed to work as an air driver prior to that?

A. No, sir.

Q. You said that Mr. Torres had been delivering ground packages, not just air packages; is that right?

A. Yes, sir.

Q. Had you asked your on road supervisors, or had you asked Mr. Teimer to be allowed to work as a full-time ground driver during the 2017 peak season?

A. I'm sorry, you said had I been asked?

Q. No. Had you asked either your center manager or your on road supervisors to be allowed to work as a temporary full-time ground driver during the 2017 peak season?

A. Yes, sir, I can't make it out at the moment though.

Q. (By Mr. Barbour) I will zoom in and I'll mark this as Exhibit 4, which is a three page document. And up at the top there's a page that says "bid acknowledgment," do you see that?

A. Yes, sir.

Q. Next to "name," there's a signature, is that your signature, Mario Scott, next to that?

A. Yes, sir.

Q. Okay. And then does it indicate that you signed this document on January 9th of 2018?

A. Yes, sir.

Q. And is that your phone number, (813)863-6441?

A. Yes, sir.

Q. And as I zoom out, did you understand that, by signing this document on January 9th of 2018, you were expressing interest in a full-time package car driver position?

A. Yes, sir.

Q. Okay. I'm done with Exhibit 4 for the time being, Mr. Scott, but we will come back to that a little while later. You said you had spoken with Ms. Garcia in HR, what did Ms. Garcia tell you was going to be required for you to complete the requirements to be

hall, Thor Johnson.

Q. Is that Thor Johnson, Mr. Scott?

A. Yes, sir.

Q. I'm going to share my screen again, Mr. Scott, and show you right now a group of text messages that your attorney has produced related to this lawsuit. And this is going to be Exhibit 5, and I'm going to zoom in so you can see these.

(Exhibit 5 marked for identification.)

Q. (By Mr. Barbour) And I see some messages that you exchanged with someone whose ID code is kcs4lpt@ups.com. Do you know who you exchanged these messages with, Mr. Scott?

A. Yes, sir.

Q. And is that Desiree Garcia?

A. Yes, sir.

Q. So these messages that I'm looking at, which are page one of Exhibit 5, up at the top do you see where it's dated January 08, do you see that, Mr. Scott?

A. Yes, sir.

Q. Okay. Does that mean that you would have exchanged these messages with Ms. Garcia on January 8th of 2018?

A. Yes, sir.

Q. And so then it looks like, as I go further

down, at 5:29 p.m. Ms. Garcia messages you and says, "Hi, Mario, did you attend the three day or the five day driver school during peak?" Did I read that correctly?

A. Yes, sir.

Q. Okay. And as I continue down, you responded, "Hey, it was the three day school," right?

A. Yes, sir.

Q. And then she messages you again, this is a couple minutes later, "And just to tell you, since you attended the three day class, in order to continue driving after January 15th, you'll have to attend the five day class in Lake Mary on January 22nd to 26th." Did I read that correctly?

A. Yes, sir.

Q. And is that a message that you actually received from Ms. Garcia?

A. Yes, sir.

Q. And then she also says, "Along with Victor and Johane," and I assume that means Victor Torres and Johane Moultin; is that right?

A. Yes, sir.

Q. Was this the first instance in which Ms. Garcia made you aware of the fact that you would need to attend a second five day training course to be eligible for a full-time promotion?

A. Yes, sir.
Q. And she asks, "Are you able to attend," and you respond, "Yes, I am;" is that correct?
A. Yes, sir.
Q. And then she says, "I already spoke with Tom Teimer, I will let Kim know in the morning. Please see me tomorrow before you leave," at 5:42, did I read that correctly?
A. Yes, sir.
Q. Who is Kim?
A. Kim, that's the manager that recently retired I was trying to think of earlier.
Q. Okay. You still can't think of her last name; is that correct?
A. No, sir, I don't know her last name.
Q. Okay. But regardless, Ms. Garcia is sending you that last message at 5:42, and at 5:43, you respond, "Okay, will do," exclamation point, don't you?
A. Yes, sir.
Q. Is fair to say that at no point in this text thread that's Exhibit 5 to your deposition, you never told Ms. Garcia, "Wait a second, it was my understanding that I already completed service provider training, and I don't know why I need to go to a second five day course," you don't say that in these texts, do you?

Q. But at the very least, you didn't say anything in these text messages that are Exhibit 5, you don't say anything here that says, "I think this is unfair, I was told that I only had to complete one training course;" is that right?
A. Yes, sir, I didn't mention that. When she told me that I had to, she started off the text message, I complied, I didn't want to lose out on an opportunity.
Q. You do agree with me though, Mr. Scott, that Victor Torres attended that second training class as well, didn't he?
A. Yes, sir.
Q. You said that Ms. Moultin didn't because she hadn't completed her DIAD training; is that right?
A. I recall, but I'm not 100 percent positive what her situation was.
Q. Did anyone else from the Bayside Center attend that second training course that was held in late January 2018 in Lake Mary, Florida?
A. Did anyone else you said?
Q. Yes, sir. Other than you and Mr. Torres.
A. I believe Anthony Cantu also, a Hispanic man I believe.
Q. When you were speaking with Desiree Garcia about the class, did she give you any materials or any

information regarding what to expect when you got up to Lake Mary, Florida?

A. Yes, sir. She gave me a packet, similar to the rest of the package, prior to going to driving school explaining everything that you needed to know, including the -- if you didn't have a credit card on file for hotel deposit, you could pay cash.

Q. Okay. I'm going to again share my screen, Mr. Scott, and do you see this document that I'm going to mark as Exhibit 6 to your deposition?

A. Yes, sir.

(Exhibit 6 marked for identification.)

Q. (By Mr. Barbour) Okay. It's a 12 page document that's Exhibit 6, and on the top of it is titled, UPS Integrad for Driver Service Providers, do you --

A. I'm sorry, my screen just -- there we go.

Q. At the top of Exhibit 6, do you see where it's titled, UPS Integrad for Driver Service Providers?

A. Yes, sir.

Q. Okay. I know this is the top of the first page, but did this appear to be the package that you were given in preparation for your training course in Lake Mary, Florida?

A. That definitely looks familiar, I still have

it.

Q. Okay. This would have been the document that Ms. Garcia gave you to give you all the information relating to the training course that you were required to attend; is that right?

A. Yes, sir.

Q. About how far from Tampa is Lake Mary, Florida, Mr. Scott?

A. Two hours I'll say, roughly, give or take, 10 over, 10 under, maybe 230, two and a half. I've only been there once, it's outside of Orlando.

Q. Okay. The only time you've ever been there was for this training course; is that correct?

A. Yes, sir.

Q. Okay. The company, UPS, put you and the other attendees in a hotel for the five day course of the training; is that right?

A. Yes, sir.

Q. And then, you know, simple things like room and board were also covered during the training, weren't they?

A. For this particular class, it was. The second class, it was not.

Q. And when you --

A. The third class, it was not.

about it in more detail, I understand that you feel like they were rude, or something along those lines, to you in Lake Mary; is that correct?

A. Yes, sir.

Q. Okay. And we will talk about that in more detail. I want to hear from you in terms of your perspective there, but those instructors at that Lake Mary Integrad facility during the three days that you were in that training class, did any of those instructors use language that you felt was a racial slur, or was racially derogatory towards you or anyone else?

A. No, sir.

Q. Am I correct that you actually drove with Mr. Torres to Lake Mary for the training class?

A. Yes, sir.

Q. And walk me through kind of what happened when y'all got to Lake Mary, did you go directly to the hotel when you first arrived?

A. They came to pick me up from my home, we went straight to the hotel, we proceeded to check in. To my surprise, unlike it said in that package that you showed, it states in that package that if you don't have a bank card for a deposit, that you can bring a $25 cash deposit. At the time I was in a pretty bad financial

the start of your day. I assume you got bussed over to the training center itself; is that right?

A. Yes, sir. We got bussed over to the training center, and we kind of got, not registered, but we kind of just went over our names, how long we've been with the company, and things like that, as individuals throughout the class. And then we started to do our daily uniform inspection, where we stand up against the wall and they make us lift our shirts, lift our pants, and it was a very harsh critique, something like I never experienced before in my life. It reminded me of the things you see in the movies as it relates to jail, boot camp, very aggressive.

Q. The instructors were, I think aggressive was the term you used, but the instructors were aggressively evaluating the attendees' appearance and uniforms; is that correct?

A. Yes, sir. Yes, sir. Stating things like, "Tomorrow make sure your shirt is creased," in which it already was, but they didn't want to see two creases, and make sure that it was -- had a single crease, and not a double crease by tomorrow, or you would be disqualified.

Q. Okay. So do you remember the name of the instructor that was doing the uniform checks himself or

herself on that first day?

A. I don't know if it was -- I believe it was Young Gun, but I'm not -- they all went by nicknames, except for Krissy, so I can't recall right now.

Q. What do you recall -- and this is that first day, that Monday morning, I suppose the instructor is going down the line, you know, and critiquing everybody's appearance and uniforms, right?

A. Yes, sir.

Q. So when that instructor gets to you, what do you recall the instructor telling you needed to be corrected in terms of your uniform and your appearance?

A. The first day, pretty much everything. Started from my side burns, which I was aware of them having to be in the middle of your ears, they couldn't go past the bottom of your ears. And once I had freshly shaved them in the middle of my ears, they told me my side burns had to be above my ears, and I had them cut above my ears the next day or I'll be disqualified. They told me the shoes in which I wore during the first school, and which I qualified, I mean, in which I drove that peak season, they told me that those shoes weren't acceptable, and to change those or I'd be disqualified, in which I bought new shoes.

They told me my pants needed to be hemmed,

and if I didn't have any sewing utensils, that I could purchase hem tape from them, in which I purchased hem tape. And they said my pants were too long, same pants, once again, that I was wearing the whole time. They told me about my creases, they told me that my pants and my shirt wasn't creased enough, and that I could be disqualified for not having the proper creases in my uniform.

Q. Okay. And you weren't wearing a belt at all that first day; is that correct?

A. Yeah, sorry about that. Yeah. They made me lift my shirt up and show them my belt line. I had a UPS shirt jacket that doesn't -- is not required to be tucked in, it's a shirt jacket that came under my belt line, but I had to lift my shirt up to show them by belt line. And I didn't have a belt, and the gentleman told me that I was required to have a black or brown leather belt the next day or I will be disqualified. And I explained to him, "No problem, I actually have a spare brown leather belt in my hotel, I'll bring it tomorrow."

I also explained to him that I had previously ordered a belt and never received it. I had previously ordered it before my first class and never received it, and I never had an issue until then. And I mentioned that I spoke to my HR prior to class as well,

early Sunday, early Sunday I shaved, and I was also told on Monday to make sure I had a fresh shave on Tuesday, in which I did everything that they asked me to do, including bringing a brown leather belt. Can I stop for just one second, sir, to take a two minute restroom break?

Q. Not a problem at all.

(Break from 11:35 a.m. to 11:38 a.m.)

Q. (By Mr. Barbour) We are back on the record, and we were talking about some of those uniform and appearance issues you had on your first day of training at Lake Mary, Mr. Scott. Did you buy a pair of shoes that night?

A. Yes, sir.

Q. Where were you able to buy that pair of shoes, was there a store nearby?

A. It wasn't nearby. Victor Torres also had to purchase a pair of shoes, so he drove us to the mall.

Q. So I guess Mr. Torres had also been told that his equipment was not up to standards either?

A. Well, I take that back, because I wasn't -- I apologize. I wasn't -- I don't believe -- they broke the whole class up into, like, four different groups, I'm not sure, and I don't believe he was in my group. And I don't know if they told him to buy a new pair of

Q. But regardless, Mr. Torres, for whatever reason, did decide that he needed or wanted to buy a new pair of shoes the evening of that first training day; is that correct?
A. Yes, sir. It could have been because I went to him asking him for a ride to the nearest store to get shoes for myself, and he then decided to get a new pair. I'm not sure.
Q. Did you talk to Desiree Garcia about this belt issue that had popped up that evening?
A. Yes, sir.
Q. Was Ms. Garcia staying at the same hotel as you?
A. Yes, sir.
Q. What did Ms. Garcia tell you on that Monday night regarding the fact that you didn't have the required belt?
A. She didn't say anything that Monday night. I spoke to her right after I finished up my appearance test before we -- during that same day of school, but I explained to Ms. Garcia that I had a brown leather belt and that I'll wear that one tomorrow, and she explained to me that they will figure out what was going on with my order, but that one should be fine as long as I have a brown or black leather belt, I shouldn't have an issue

going forward.

Q. So let's move on to Tuesday morning then, this is the second full day of training. And was the routine on Tuesday roughly the same as it had been on Monday, the day prior?

A. Pretty much, yes, sir.

Q. Okay. Did the instructors split the Integrad training attendees into small groups for the uniform checks again?

A. Yes, sir.

Q. Had you shortened your side burns and hemmed your pants like they had talked about?

A. Yes, sir. I purchased hem tape from them, I cut my side burns, I shaved again, I creased my shirt to the best of my ability, and I came equipped with a brown leather belt.

Q. Did the instructors say or seem to think that your uniform crease and your shave and your shoes were all compliant with their expectations?

A. Yes, sir.

Q. What about your belt?

A. When they had me lift up my shirt to show them my belt, he said that my belt was brown and leather, but that it was a braided brown leather belt, and that it had to be solid brown or black leather, which I'd never

heard before. They told me there couldn't be any designs on it, which there wasn't any designs on it, it was a regular brown braided casual belt. They told me if I didn't have one by Wednesday, that I would be disqualified.

Q. Okay. Did you see any other attendees at this class who had a braided belt on rather than just a plain leather belt?

A. No, I didn't, it was too intense to really pay attention to what everybody else had on.

Q. What was your response when they told you that you needed to get a plain leather belt on Tuesday?

A. "Yes, sir, will do."

Q. Didn't another attendee offer to loan you a plain leather belt that he had in his own possession?

A. Yes, sir. Simultaneously, as they were explaining to me I had to have -- that that belt wasn't going to work, I had to have a different belt, the gentleman that was actually in group mentioned, "Hey, don't worry about it." Never met this guy before prior to that, he mentioned, "Hey, don't worry about it, I have a extra solid brown leather belt in the room that you can borrow," and I said okay.

Q. Okay. Do you remember that other gentleman's name who offered to loan you that belt?

A. No, sir. I have the document with his name on it, but I don't remember his name.
Q. Was he from the Bayside Center, or some other facility?
A. I think it was out of Jacksonville, Florida.
Q. Okay. And so that's the uniform check, and that concludes -- did you otherwise complete the second day of training?
A. Yes, sir.
Q. When you got back to the hotel on Tuesday evening, did you get this other belt from the gentleman who had offered to loan it to you?
A. Yes, sir. I got it Monday -- Wednesday morning prior to class.
Q. Did you put that belt on prior to arriving at class?
A. Yes, sir.
Q. Okay. So did the uniform check appear, you know, to occur roughly the same way on Wednesday as it had on Monday and Tuesday?
A. Yes, sir.
Q. What do you recall of your uniform check when it occurred on Wednesday?
A. They went through my whole appearance from top to bottom, they checked me off on everything. And,

lastly, had me lift up my shirt, and he looked at my belt and he told me to wait in the hall, he didn't give me a reason, he just told me to go wait in the hallway, and I complied.

Q. And was it your recollection that you had a just plain leather belt on on Wednesday?

A. Yes, sir, I had a brown plain leather belt.

Q. There was no fabric on this belt, it was just a strip of leather with a belt buckle?

A. It was a brown plain leather belt. It wasn't brand new, obviously, it's from the gentleman in the class, but it was brown leather.

Q. And I know we're getting down into minutia here, but you said it was brown leather, but was there any fabric on the belt? Was it fabric, or was it leather with fabric sewn onto it, or was it just leather that you were wearing as of Wednesday morning?

A. From my understanding, I don't believe any belt is -- I think it's all fabric, and then the leather is wrapped around the fabric underneath. From my understanding, it was just a brown plain leather belt.

Q. Was there any fabric visible on the outside of the belt, I guess is the question that I'm intending to ask?

A. It's been so long since I seen it. It probably

had a little worn, it shown that it was worn, but it was a brown leather belt. It may have been, like I said, been worn, but it was, like, no fabric outside of it, just regular wear and tear.

Q. Do you have a picture of that belt that you were wearing on that day by chance?

A. Yes, sir. I submitted it to the union representative right after I was disqualified.

Q. So that picture that you had sent in as part of your grievance, that would be a picture of the belt that -- (audio cutting out.)

(Reporter requests clarification.)

Q. (By Mr. Barbour) Okay. The picture that you submitted in relationship to your grievance, that would be a picture of the belt that you were wearing on Wednesday when you were disqualified from training school; is that correct?

A. The picture that I submitted, yes, sir.

Q. So the instructor sees your belt, and they tell you to wait outside; is that correct?

A. Yes, sir.

Q. Who came up and spoke to you next?

A. Went outside, and then one of the gentlemen came outside, I think it was the guy who went by Big Dog, came outside and told me to go wait in the office.

Q. Okay. Did you see any other individuals -- well, let me strike that. Again, you told me that you didn't have a chance to look at any of the belts worn by any of the other attendees at the training session; is that right?

A. I didn't have a chance to look at any of the other belts.

Q. So when you got back to the hotel room, I understand you checked out of your room, you eventually were able to travel back to Tampa that same day, weren't you?

A. Yes, sir. I got back to my hotel very emotional, and I pleaded with the concierge at the hotel to allow me a little extra time past 12:00 to remain in the hotel until I could find a ride to actually come pick me up, because I had just been disqualified. I'm sure they got the memo, and I was told to check out of the hotel by noon.

Q. I mean, did you get a personal family member or a friend to come pick you up, or how did you actually get transported back to Tampa?

A. Yes, sir. I was able to get in contact with a friend of mine who drove two plus hours to come pick me up.

Q. I want to be clear, it's your testimony that

this number that says (813)328-5442, do you see that?
A. Yes, sir.
Q. Do you know whose phone number that is?
A. That's Desiree Garcia.
Q. Okay. So you're again texting with Ms. Garcia at this point, correct?
A. Yes, sir.
Q. So then this text message seems to show that on Thursday, January 25th, she texted you and said, "Hey, Mario, what size belt do you need," and recommends you get a belt at least one to two sizes above your pants size; is that right?
A. Yes, sir.
Q. Okay. So then your message to her, you said that your phone was dead because you left the charger, and you said, "Finally decided to go buy one at the local 7-11." I presume you're referring to a cell phone charger and not a belt; is that correct?
A. Yes, sir.
Q. So after you come back and you're disqualified from service provider training, you return to your preloader position, didn't you?
A. Yes, sir.
Q. So you go back to working part-time, it wasn't as if you'd been terminated from UPS; is that right?

from the company.

Q. I'm going to go back and I'm going to show you what I previously marked as Exhibit 4 to your deposition, Mr. Scott, and we looked at this document back when we were talking about you going to the Lake Mary facility. The top of it was bid acknowledgment, you see that, correct?

A. Yes, sir.

Q. And as I go about half way down page one, there's a date that says 2/15/18, do you see that?

A. Yes, sir.

Q. And someone has handwritten, "Mario Scott has declined this FSP position," and does FSP stand for full-time service provider?

A. I believe so, yes, sir.

Q. And then it says, "Due to feeling threatened by the facilitators of the class." Do you know who hand wrote that?

A. Desiree Garcia.

Q. And then as I look off to the left, is that your handwritten signature over there in blue next to that typewritten -- or that handwritten statement?

A. Yes, sir, my initials also, and circle around "interested" also.

Q. So by you signing this document that is Exhibit

4 to your deposition, were you saying that you were declining the chance to return to and complete that training in Lake Mary, Florida?

A. Based on the size belt that I was given and the same facilitators who kicked me out, she didn't write everything down that I was mentioning to her at the time. And once again, I was very bothered and confused, anxious, emotional at the time, because I had -- because of what happened to me prior. And my reasons for not going back is because she just gave me a 38, and was sending me back to the same individuals. I was in no way, shape, or form denying the opportunity to become a full-time package driver.

Q. Fair. But you were declining the chance to go back to training in February of 2018, weren't you?

A. If I wasn't presented with a proper belt, then yes, I wasn't going to go back with the wrong belt. I just was just in fear of the threats that they were making about disqualifying me, as I know now they were definitely real. So I didn't want to be threatened again, and be forced to have to try to find a belt once I was already getting a belt I'm sure they would have deemed to be too big for me, to say the least.

Q. And my question, it was very general, and that is you did decline the offer to go back to the Lake Mary

training facility at the end of February 2018, didn't you?

A. Based on those conditions that I just mentioned, yes, sir.

Q. Okay. And in terms of the size of the belt, you've signed this document that's Exhibit 4, but you didn't add in there that another reason that you were declining the chance to go back to that facility was because of the size of the belt, did you?

A. No. I didn't have any -- she wrote that herself, like I said, I was very emotional at the time.

Q. When you say you were threatened by the facilitators, am I correct that the facilitators threatened to disqualify you from the training course?

A. Pretty much every day I was there I was told if I didn't do this, if I didn't do that, I would be disqualified, which is made me very uneasy. I was there to actually get the job and provide for my family, not be disqualified or kicked out half way through the class.

Q. Right. But other than saying, "We're going to disqualify you if you don't meet our expectations," they didn't threaten you in any other ways, did they?

A. No, sir.

Q. Other than that facility in Lake Mary, were

correct?

A. Ultimately, I passed after everything that they put me through, yes, sir.

Q. So I appreciate that. So that's some more detail, definitely I appreciate that. Other than what we've talked about so far, just those additional incidents on top of what we've already discussed, are there any other ways in which you feel like you've been discriminated against because of your race, or retaliated against by UPS?

A. No, sir, not at the moment.

Q. In terms of, you know, whether you feel like you've been treated less favorable than other employees, obviously from reading your documents and listening to your testimony, I understand that you feel like Victor Torres probably got preferential treatment; is that correct?

A. Yes, sir.

Q. Other than Mr. Torres, are there any other employees who you feel got preferential treatment when compared to you, and by virtue of whom you feel you've been discriminated against or retaliated against?

A. Well, I'm not -- not as it necessarily relates to my case per se, but as far as other individuals, such as Brendan O'Grady, Robert Gallardo, even Allen Lucciola

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARIO SCOTT *
*
*
VS. * Case No.:
* 8:19-cv-1363-T-36SPF
*
UNITED PARCEL SERVICE *

*******************************************************

REPORTER'S CERTIFICATION
DEPOSITION OF MARIO SCOTT
JULY 27, 2020
(Reported Remotely)

*******************************************************

I, TRICIA FOX WILLIAMS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MARIO SCOTT, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____________ to the witness or to the attorney for the witness for examination, signature and return to me by _______________;

That the amount of time used by each party at the deposition is as follows:

MR. JUSTIN BARBOUR - 03 HOURS:44 MINUTE(S)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

MR. JERRY GIRLEY, Attorney for Plaintiff
MR. JUSTIN BARBOUR, Attorney for Defendant

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this ______ of

__________________, 2020.

TRICIA FOX WILLIAMS
Certified Court Reporter

Certification Number: 8273
Date of Expiration: 10/31/2022
Firm Registration Number: 341
Business Address:
US Legal Support
4801 NW Loop 410, Suite 375
San Antonio, Texas 78229
(210)734-7127