# Exhibit 5

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Case No. 8:19-cv-1363-T-36SPF**

MARIO SCOTT,

Plaintiff

vs.

UNITED PARCEL SERVICE,

Defendant.

______________________________________/

## DECLARATION OF TOM TEIMER

I, Tom Teimer, declare as follows:

1. My name is Tom Teimer. I am over the age of eighteen, am competent to testify, and the stated facts in this declaration are within my personal knowledge.

2. I have been employed by United Parcel Service, Inc. (Ohio) ("UPS") for approximately 34 years. I am currently the Business Manager in UPS's Tampa Bayside Center, a position I have held for 35 years.

3. UPS is one of the world's largest delivery and logistics companies. The company's small package centers, such as the Bayside Center, each operate a fleet of the company's iconic brown delivery vehicles, which are known within UPS as "package cars." These package cars are operated by the company's Package Car Drivers, whose job responsibilities generally include the safe operation of their vehicles and delivering packages to, and retrieving packages from, the company's customers.

4. Most of the general public's contact with UPS occurs through interactions with the company's Package Car Drivers. Due to their public-facing positions, UPS requires Package Car Drivers follow established appearance, grooming, and uniform rules, commonly known as the company's Appearance Guidelines.

5. As one might expect, the holiday season is particularly busy for UPS. During this time of year—known within the company as its "peak" season—the company handles a significantly higher volume of customer packages. To aid with the sorting and delivery of these additional packages, the company requires additional employees, including Package Car Drivers, to meet its temporary peak season needs. Thus, the company may allow certain individuals to

work as temporary Package Car Drivers during this time period, or it may post temporary Driver positions for bids by interested employees.

6. For example, on or around September 19, 2017, the Bayside Center posted temporary Saturday Air Driver positions for bid, in preparation for the coming peak season. Various employees, including the Plaintiff Mr. Scott, bid on this position. As the job titles suggests, Air Drivers deliver overnight packages designated for expedited delivery.

7. Employees who bid on vacant bargaining unit positions are selected based on their seniority. However, mere seniority is not by itself sufficient to allow an individual to obtain a Package Car Driver position. UPS's safety and training procedures require candidates to complete a host of prerequisites—including attending required training courses, obtaining a DOT card, completing supervised rides, and generally exhibiting the ability to safely perform the functions of a Package Car Driver—before they can obtain such a position.

8. Because the Saturday Air Driver positions posted in September 2017 were temporary peak season positions, the candidates for those positions were not required to complete the more rigorous training required of full-time candidates. Instead, these candidates were required to complete a three-day training course offered locally within the Tampa area. Mr. Scott, as well as other Bayside employees including Johane Moultin, Victor Torres, and Anthony Cantu, completed the three-day course and qualified as to drive on a temporary basis during the 2017 peak season.

9. Notably, UPS's personnel records reflect that Mr. Scott and Mr. Torres have the same seniority date—January 4, 2012. Both Mr. Scott and Mr. Torres also attended the same local three-day driver training course in 2017, obtained their DOT cards on the same day, and both began driving on a part-time basis during the 2017 peak season.

10. After qualifying as a Driver, Ms. Moultin and Mr. Torres both indicated to me that they would be interested in delivering ground packages, in addition to Saturday air deliveries. At that time, the Bayside Center's significant peak season volume warranted extra assistance in delivering ground packages. Thus, I confirmed with the Florida District Labor Managers that the CBA would allow qualified Drivers to deliver these ground packages, as well. The Labor Manager confirmed this was accepted, and Ms. Moultin and Mr. Torres were therefore approved to operate routes delivering ground packages, as well.

11. Shortly thereafter, Mr. Scott also expressed interest in delivering ground packages. The Bayside Center's significant volume still necessitated additional Package Car Drivers, and as such I also approved Mr. Scott to work as a Driver delivering ground packages, as needed, in addition to Saturday air packages during the upcoming peak season.

12. I am not aware of Mr. Scott having filed a grievance with the union complaining that he was denied the opportunity to deliver ground packages during the 2017 peak season. Similarly, Mr. Scott never told me that he believed he had been discriminated against based on his race or skin color with regard to the assignment of driving work during the 2017 peak season.

13. UPS's package volume typically returns to normal levels by mid-January, at which point the company's peak season is deemed to end. At that time, the company's temporary peak season employees typically return to their former positions and pay rates. In Mr. Scott's case, at the end of the 2017 peak season this meant returning to his Preloader position.

14. Nonetheless, in January 2018, several full-time Package Car Drivers were posted in the Bayside Center. Several employees, including Mr. Scott and Mr. Torres, bid for these positions.

15. Full-time Driver candidates must complete a host of demanding prerequisites to qualify for that position. In particular, such full-time candidates must complete an intensive weeklong training course, such as those offered through UPS's Intergrad training facilities. This weeklong course must be completed even if the candidates have previously completed a shorter course within the local area, such as Mr. Scott and Mr. Torres had done in 2017. Failure to complete these courses will result in a candidate's disqualification from the training process, and they are then returned to their former position with the company.

16. Mr. Scott, Mr. Torres, and other full-time candidates were sent to an Intergrad training course in Lake Mary, Florida in January 2018. Prior to leaving for this course, Mr. Scott did not tell me, or to the best of my knowledge any other management personnel in the Bayside Center, that any part of his uniform was missing or incomplete.

17. I understand that Mr. Scott was disqualified from the January 2018 training course due to repeated violations of the Appearance Guidelines. I played no role in the decision to disqualify him from that Intergrad training course, and after his disqualification he returned to his Preloader position in the Bayside Center.

18. Several weeks later, in mid-February 2018, Mr. Scott was offered another chance to complete this required training. Mr. Scott declined the chance to attend that training course and, by extension, also passed on a chance to obtain a full-time Driver position at that time.

19. Mr. Scott eventually completed the weeklong training course several months later, and as of today is employed as a full-time Package Car Driver in the Bayside Center.

20. I understand that Mr. Scott believes he was subject to race discrimination or retaliation during his employment with UPS. At no point during Mr. Scott's employment with UPS have I ever considered his race or any concerns he may have raised in making employment decisions affecting him. Instead, at all times the decisions made regarding Mr. Scott have been based solely on company policies, procedures, and the terms and conditions CBA.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on December 4, 2020.

Tom Teimer